JOHN B. KELLOGG,                    )
                                    )
        Plaintiff,                  )        Court No. 11 C 7603
                                    )
        v.                          )        Judge Edmond E. Chang
                                    )
BNSF RAIL WAY COMPANY a/k/a         )
BURLINGTON NORTHERN SANTA FE        )
RAILWAY COMPANY,                    )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION AND ORDER

After the train he was operating nearly collided with another due to a malfunctioning traffic signal, Plaintiff John B. Kellogg brought this negligence action against his employer, Burlington Northern Santa Fe Railway Company, under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60.[1] Both Kellogg and Burlington have moved for partial summary judgment. For the reasons given below, Kellogg's motion is granted and Burlington's motion is denied.

### I. Background

On November 11, 2008, Kellogg was the conductor operating a Burlington freight train on a routine run from LaCrosse, Wisconsin to Cicero, Illinois.[2] PSOF ¶ 3. As the train rolled through Milledgeville, Illinois, where the railroad has only a

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

[2]For purposes of the competing summary judgment motions, the Court views the evidence in the light more favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Relevant facts are mostly drawn from Kellogg's Statement of Facts (PSOF) [R.52-2], Burlington's Statement of Facts (DSOF) [R. 55], and Kellogg's Statement of Additional Facts (PSOAF) [R. 60].

single track, a green signal cleared Kellogg to guide the locomotive into a curving, mile-long stretch at 60 miles per hour. *Id.* ¶¶ 4-7. But all was not clear: it was then that Kellogg spotted the top of a tall container railcar in the distance above the tree-line—another train on the same track that should have been clear. *Id.* ¶ 7. The train's engineer immediately engaged the "emergency brake application" and the entire crew scrambled onto the train's exterior catwalk, getting ready to evacuate. *Id.* ¶ 8. Kellogg could not tell if the tree-obscured train ahead of them was sitting stationary or instead moving head-on towards them, and he hesitated between leaping off a train that was still running close to 60 miles per hour versus risking an imminent collision and a diesel-fueled explosion. *Id.* ¶ 9. It took 45 seconds for the train to come to a full stop. *Id.* ¶ 10. It did so some twenty car lengths short of the other train and, ultimately, Kellogg never jumped. Compl. ¶ 14.

The signal that had improperly failed to alert Kellogg to stop the train functioned through "pole line DC track circuits," two sets of two steel wires each, normally kept in tension and two feet apart in order to prevent their currents from coming into contact. PSOF ¶¶ 11-13. On the day of the incident, the sets of wires had become wrapped together, creating an electrical charge that caused the signal to show green when it should have been red. *Id.* ¶¶ 15-16.

Although the parties do not dispute that the wire wrap was responsible for the "false proceed signal," they characterize the facts surrounding the pole line's maintenance very differently. According to Burlington, it carried out monthly "ground tests" to ensure the signal circuitry was in working order. DSOF ¶ 2. Signal

maintainers also physically inspected the pole line for issues or defects on a semiannual basis, including in February and September 2007 and in March and August 2008. *Id.* ¶¶ 4-7. Burlington signal crews walked near the pole line in question on October 8, 2008, specifically to inspect for sagging wires and wire wraps but evidently found no problem. *Id.* ¶ 8. A crew returned again with a week with the same result. *Id.* ¶ 9. On the day of the near-collision, thirteen trains traveled on the same track in the same direction as Kellogg's train without complication. *Id.* ¶ 10. Burlington therefore states that it had no notice of any problem before the day of the incident. *Id.* ¶ 11. The company reported the incident to the Federal Railroad Administration (FRA), whose report determined that the wire wrap had been the "result of severe storms." *Id.* ¶ 13.

In Kellogg's characterization of the events, Burlington received several "failure to clear" reports about the Milledgeville signal in the two months leading up to the "false proceed," but ultimately failed either to properly check for or to fix wrapped wires. PSOAF ¶¶ 1, 10. According to Kellogg's expert, wire wraps from improper tension in pole lines, which become slacker over time, ordinarily take months, if not years, to develop. *Id.* ¶ 7. Kellogg also adds that although Burlington had in place a "post-storm inspection protocol," this policy did not cover inspection of pole line wires. *Id.* ¶ 13.

Kellogg filed this lawsuit in October 2011, alleging that he had suffered emotional distress from the ordeal of the near-miss collision, as caused by Burlington's negligent signal upkeep. Compl. Burlington moved to dismiss the

complaint, arguing that Kellogg could not raise a negligent infliction of emotional distress claim because he had never been in a physical "zone of danger." R. 9, Def.'s Mot. Dismiss at 2. This Court denied the motion, holding that the small margin of error before collision with the train ahead of him, an allegation accepted as true, had placed Kellogg in imminent threat of serious physical harm. R. 21, Mem. Op. and Order dated June 20, 2012 at 5-6. The case thus proceeded to discovery, and upon its completion, both parties moved for partial summary judgment. R. 52, Mot. Summ. J.; R. 56, Def.'s Resp. and Cross-Mot. Summ. J.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law.

*Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

It is undisputed that under FELA, Burlington, as a "common carrier by railroad," is liable for any injuries "resulting in whole or in part from the negligence of any of [its] officers, agents, or employees." 45 U.S.C. § 51. Liability, in turn, can be established where the injury results from a railroad's violation of a statutory or regulatory provision meant to protect worker safety—the principle of negligence *per se. See Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438-39 (1958); *accord Schmitz v. Canadian Pac. Ry. Co.*, 454 F.3d 678, 683 (7th Cir. 2006) ("*Kernan* . . . established a bright-line rule that a FELA employer's violation of a statutory or regulatory duty gives rise to FELA liability for a resulting employee injury[.]"). *See also* 45 U.S.C. §§ 53, 54(a).

Kellogg argues that the evidence shows, as a matter of law, that Burlington violated two such provisions—one, a FRA regulation requiring signal wires to be free of interference, and the other, a statute requiring the safe operation of signal systems. Pl.'s Mot. Br. at 4-6. Burlington believes that because the record demonstrates that the railroad complied with the plain language of the provisions, or alternatively because any non-compliance was attributable to unforeseeable weather, Kellogg cannot possibly satisfy his burden of establishing negligence.

Def.'s Mot. Br. at 3-5, 9-10. The parties are therefore in agreement that the issue of Burlington's negligence can be resolved as a matter of law, all depending on the proper interpretation of what these provisions required of the railroad.

## A. 49 C.F.R. § 236.71

FRA regulations impose various duties on railroads, and one in particular imposes a duty concerning signal wires: "[s]ignal wire on pole line shall be securely tied" and "shall not interfere with, or be interfered by, other wires on the pole line." 49 C.F.R. § 236.71. According to Kellogg, because Burlington has conceded that the pole line wires had been inappropriately wrapped, causing the false green signal, the railroad has violated this provision, establishing its negligence under FELA. Pl.'s Mot. Br. at 6. Burlington contends that Kellogg's view ignores the broader framework of that regulation, which must be read in conjunction with the rest of the section in which it is found, dealing with the maintenance and repair of signal systems throughout a rail system. Def.'s Mot. Br. at 3-4. Section 236.11, in particular, states:

> When any component of a signal system, the proper functioning of which is essential to the safety of train operation, fails to perform its intended signaling function or is not in correspondence with known operating conditions, the cause shall be determined and the faulty component *adjusted, repaired or replaced without undue delay*.

49 C.F.R. § 236.11 (emphasis added). In Burlington's view, Section 236.11 constitutes a "curative provision," providing the railroad an opportunity to promptly investigate and repair any defect. Def.'s Mot. Br. at 4.

Burlington has not found the safe harbor it believes it has. Burlington believes it meaningful that the chance to cure in § 236.11 is absent in other railroad safety statutes, which all establish strict liability standards. *Id.* at 3-4 (giving examples of Locomotive Inspection Act and Safety Appliance Act). According to Burlington, failure to meet § 236.71's requirements for signal wiring thus was not, unlike these other statutes, intended to give rise to automatic liability on its own, absent an undue delay in making repairs. *Id.* at 4. But Burlington misses a more fundamental point. The existence of a regulatory provision mandating an employer to *cure* a defect does not somehow negate a separate duty to *prevent* that defect in the first place. In other words, the obligation to keep pole line wires from interfering with each other under § 236.71 is distinct from an obligation to inspect and to repair wires when they do interfere under § 236.11. And even if the two independent provisions are read as part of the same framework as Burlington urges, nothing in their language suggests that one was meant to be contingent on the other, as opposed to setting stand-alone duties. Burlington's expansive reading of § 236.11's meaning is simply not evinced by the regulatory text, irrespective of whether similar curative provisions are found in other railroad safety statutes.

Burlington's citation to a federal district court opinion from Pennsylvania does not help the railroad. In *Monheim v. Union R.R. Co.*, the court held that the plaintiff, the estate of a deceased rail worker, could proceed with a negligence claim against the defendant-railroad based on its failure to properly maintain a traffic signal under § 236. 788 F. Supp. 2d 394, 401-02 (W.D. Pa. 2011). Although

Burlington emphasizes that the court did not invoke strict liability from the failure to comply with the regulation, that issue was not actually raised. The plaintiff in that case did not raise a theory of negligence *per se* as Kellogg does here. *Id.* at 401. The railroad worker's estate apparently chose to pursue a traditional negligence claim in its pleadings, but that fact does not mean that the alternate theory of negligence *per se* under § 236.71 was not also viable.

Accordingly, because Burlington did not satisfy an independent regulatory duty to keep pole line wires from becoming wrapped, regardless of when the fault was repaired, Kellogg has satisfied as a matter of law that the railroad committed negligence *per se* under FELA.[3]

## B. 49 U.S.C. § 20502(b)

Because Burlington's negligence has been established through the violation of the signal wire regulation, Kellogg might be satisfied with that conclusion alone, and proceed to trial on it. But the Court will consider Kellogg's separate statutory argument in the event that Kellogg planned on presenting both arguments, even if the regulatory violation establishes negligence *per se*. Unlike the regulation, neither party would be entitled to summary judgment on the statutory-violation theory. Under the Signal Inspection Act, "[a] railroad carrier may allow a signal system to

---

[3]To be clear, the finding of negligence *per se* as a result of Burlington's violation of 49 C.F.R. § 236.7 means that Kellogg has met his burden of proving the elements of foreseeability, duty, and breach as part of a negligence claim. *See Walden v. Ill. Cent. Gulf R.R.*, 975 F.2d 361, 364 (7th Cir.1992). As a result, Burlington's argument that it cannot have been negligent because it had no constructive notice of the signal malfunction is misplaced. Def.'s Mot. Br. at 10-12. It still remains, however, for Kellogg to satisfy the final elements of causation and damages at trial. *See Buss v. BNSF Ry. Co.*, 08 C 6720, 2010 WL 2836736, at *2 (N.D. Ill. July 12, 2010).

be used on its railroad line only when the system . . . may be operated safely without unnecessary risk of personal injury" and has been inspected. 49 U.S.C. § 20502(b). Kellogg contends that, as with the signal wire regulation, Burlington violated this statutory duty, thus establishing negligence *per se*, while Burlington counters that it is entitled to partial summary judgment because it complied by conducting regular inspections. Pl.'s Mot. Br. at 6; Def.'s Mot. Br. at 10.

The problem here is that unlike the text of 49 C.F.R. § 236.71, which sets out an unequivocal, strict liability standard for pole line wire maintenance, this statutory provision establishes a more nuanced duty. The parties have opposing factual assertions about how adequately Burlington inspected and responded to any wiring problems. In other words, whether the signal system was operated with an "unnecessary risk of injury" is a factual question for a jury to determine. *See Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 961 (N.D. Ill. 2001) ("The existence of a defendant's duty is a question of law, but whether there was a breach and proximate cause are jury questions.") (citations omitted). Therefore, neither party would be awarded summary judgment as a matter of law on the basis of § 20502(b).

### C. Act of God Defense

Finally, the Court turns to Burlington's assertion that it cannot be held liable for the signal malfunction, even if negligence *per se* were to apply, because the wrapped wires were caused by unforeseeable strong winds and heavy rains—in

other words, an "act of God" defense. Def.'s Mot. Br. at 5-6. This argument is without merit.

As a threshold matter, it is unclear to the Court, and Burlington provides no authority in support, that an act of God defense may be asserted in the face of negligence *per se* by virtue of an established regulatory violation. In any event, even assuming that the defense may be asserted, the occurrence of strong winds and heavy rains is not sufficient to support the defense. "A loss or injury is due to the act of God when it is occasioned exclusively by natural causes such as could not be prevented by human care, skill and foresight." *Villegas v. Kercher*, 137 N.E.2d 92, 97 (Ill. App. Ct. 1956) (quoting *Welfelt v. Illinois Cent. R. Co.*, 149 Ill. App. 317, 326 (1909)). Paradigmatic examples include "[e]xtraordinary floods, storms of unusual violence, sudden tempests, severe frosts, great droughts, lightning[ ], earthquakes, sudden deaths and illnesses." *Gleeson v. VA. Midland Ry. Co.*, 140 U.S. 435, 439 (1891). By contrast, "a rainstorm is a reasonable and foreseeable event." *Am. Nat. Red Cross v. Vinton Roofing Co.*, 629 F. Supp. 2d 5, 11 (D.D.C. 2009) (dismissing attempt to characterize rainfall as substantial and sudden because even substantial rainfall is foreseeable to a roofing company). "Most courts flatly hold a rain [even] of unusual amount is not an act of God." *Garner v. Ritzenberg*, 167 A.2d 353, 354 (D.C. 1961) (rainfall heavy enough to create a flash flood not an act of God); *see also Shea-S & M Ball v. Massman-Kiewit-Early*, 606 F.2d 1245, 1249 (D.C. Cir. 1979) ("Heavy rainfalls, unless they are unusual and extraordinary, are not considered acts of God."). There is nothing extraordinary about the type of weather cited by

Burlington, nor, for that matter, does the company even offer minimal details about the purported storm (or storms), including when it (or they) even occurred. The lack of detail dooms Burlington's argument.

The cases that Burlington cites to suggest otherwise do not help the railroad, and indeed show how far short Burlington's argument falls. The district court in *Skandia Ins. Co. v. Star Shipping AS* found that the defendant shipping company was not liable for damage to goods caused by a particularly unpredictable hurricane. 173 F. Supp. 2d 1228, 1252 (S.D. Ala. 2001) *aff'd sub nom. Skandia Ins. Co. v. Star Shipping Co.*, 31 F. App'x 201 (11th Cir. 2001). That event cannot seriously be compared to the generically-described heavy rains and strong winds that purportedly caused the Milledgeville wires to become wrapped. In *Raudenbush v. Baltimore & O. R. Co.*, the court declined to hold a railroad responsible when a worker was killed after slipping on a snow-covered railcar sill. 160 F.2d 363, 364-65, 367 (3d Cir. 1947). The court specifically noted the slight snowfall that had been involved, *id.* at 367, and held that there was no need for the railroad to clean the very thin coating left by the snow. This was not an act of God case at all. Even more confusing is Burlington's reliance on *Ford v. New York, N.H. & H.R. Co.*, which involved whether grease left on a handle bar constituted negligence and not any natural phenomenon. 54 F.2d 342, 343 (2d Cir. 1931). That case was not about acts of God, but instead concerned negligence *per se* through a breach of statutory or regulatory provisions (which has been established in this case).

In sum, Burlington's reliance on heavy storms and winds to buttress an act of God defense (provided it can even be asserted in this case of negligence *per se*) is unfounded as a factual matter, lacking the requisite event of an unforeseeable and extraordinary nature. The railroad's unspecified reference to rains and winds cannot shield it from entry of summary judgment on its negligence.

## IV. Conclusion

For the reasons stated in this opinion, Kellogg's motion for partial summary judgment on the issue of negligence is granted and Burlington's cross-motion for partial summary judgment is denied. The issues of causation and damages remain to be resolved. Before the next status conference on October 9, 2014, the parties are directed to discuss settlement in light of the resolution of the cross motions, but otherwise should be ready to discuss the next step of the litigation.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 26, 2014